# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 16-4212

———————————————

Pauline Sagoe

*Petitioner*

v.

Jefferson B. Sessions, III, Attorney General of the United States

*Respondent*

——————————

Petition for Review of an Order of the
Board of Immigration Appeals

——————————

Submitted: October 18, 2017
Filed: April 5, 2018

——————————

Before LOKEN, MURPHY, and COLLOTON, Circuit Judges.

——————————

LOKEN, Circuit Judge.

Pauline Sagoe, a native and citizen of Ghana, entered the United States in May 2000 as the nonimmigrant fiancée of United States citizen Samuel Lassor. Sagoe and Lassor married in July 2000, and she was granted lawful permanent resident status on a conditional basis. In December 2002, Sagoe and Lassor petitioned to remove the conditions. In September 2007, after extensive investigation, the Department of Homeland Security (DHS) denied the petition and terminated Sagoe's permanent

resident status, finding that she failed to establish that the marriage was bona fide and not entered into primarily to secure an immigration benefit. See 8 U.S.C. § 1186a(c)(3)(C). DHS then commenced removal proceedings. After an evidentiary hearing, the immigration judge (IJ) upheld the termination of permanent resident status and ordered Sagoe removed. The Board of Immigration Appeals (BIA) affirmed. Sagoe petitions for review of the BIA's final order of removal. We conclude that substantial evidence supports the agency's decision and therefore deny the petition for review. See Abuya v. Sessions, 873 F.3d 650, 652 (8th Cir. 2017) (standard of review).

## I. The Statutory Framework.

An alien who marries a U.S. citizen may be granted permanent resident status on a conditional basis. 8 U.S.C. §§ 1151(b)(2)(A)(i), 1154(a)(1)(A)(i), 1186a(a)(1). To remove the conditions, the alien and U.S.-citizen spouse must timely file a joint Form I-751 Petition to Remove the Conditions on Residence. In support, the couple must submit facts and information showing that "the qualifying marriage . . . was not entered into for the purpose of procuring an alien's admission as an immigrant," 8 U.S.C. §§ 1186a(c)(1)(A), (d)(1)(A)(i)(III), and must appear for an interview before a DHS officer, § 1186a(c)(1)(B). "If the Secretary of Homeland Security determines that such facts and information are not true, the Secretary . . . shall terminate the permanent resident status of an alien spouse." § 1186a(c)(3)(C). An alien whose permanent resident status is terminated is deportable. § 1227(a)(1)(D)(i). If the alien spouse seeks review of the Secretary's determination in removal proceedings, DHS must establish, "by a preponderance of the evidence, that the facts and information described in subsection [§ 1186a(d)(1)] and alleged in the [I-751] petition are not true with respect to the qualifying marriage." § 1186a(c)(3)(D).

To prove that a marriage was entered into to "procur[e] an alien's admission as an immigrant," DHS must establish the couple did not intend "to establish a life

together at the time they were married." Abuya, 873 F.3d at 652 (quotation omitted). "Though the couple's intent at the outset of the marriage is the relevant question, when assessing the couple's intent, courts look to both the period before and after the marriage." Id. at 653 (quotation omitted). Evidence of intent can take many forms, including listing one's spouse "on insurance policies, property leases, income tax forms, or bank accounts . . . [and] other evidence regarding courtship, wedding ceremony, shared residence and experiences." Matter of Laureano, 19 I. & N. Dec. 1, *3 (BIA 1983). Whether Sagoe's marriage to Lassor was a sham is a question of fact. Abuya, 873 F.3d at 652. "[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); see Hassen v. Mukasey, 534 F.3d 927, 929 (8th Cir. 2008).

## II. Factual and Procedural Background.

**A. The Initial Agency Decision.** Sagoe entered the United States on May 13, 2000, arriving in New York on a K-1 fiancée visa and staying in New Jersey four days with Theodore Kudayah, whom she described as a family friend, before joining Lassor in Minnesota. Sagoe and Lassor married in a courthouse in Stillwater, Minnesota on July 14, 2000; no family or friends attended. In December 2002, Sagoe and Lassor filed an I-751 petition to have Sagoe's conditional status removed. The couple separated in February 2003. In November 2003, DHS's predecessor agency issued an I-751 Notice of Intent stating that the evidence submitted with their petition "is not sufficient to warrant favorable consideration" and requesting additional documents "showing joint ownership of assets and joint responsibility for liabilities." Lassor died in December 2003 with the I-751 petition pending.

After Lassor's death, Margaret Abraham, Lassor's sister who also lived in Minnesota, made the funeral arrangements and was appointed personal representative of Lassor's estate. In early 2004, Sagoe claimed to be Lassor's surviving spouse, and Abraham contacted immigration authorities, alleging that Sagoe and Lassor's marriage

was a sham and forwarding a copy of Lassor's death certificate issued in December 2003 that listed him as "never married." In June 2004, Sagoe appeared for an I-751 petition interview with DHS Adjudications Officer Jennifer Skwira. Sagoe submitted an amended death certificate issued in March 2004 that listed Lassor as married to Pauline Sagoe. Skwira testified that she believed this discrepancy warranted additional questioning and then undertook a comprehensive investigation into Sagoe and Lassor's marriage. In September 2007, the Field Office Director issued a letter advising Sagoe that the I-751 petition was denied. The lengthy letter summarized the results of the agency's investigation:

- The record included a letter to immigration authorities that Lassor drafted a month before marrying Sagoe, but never sent, stating that "I wish to withdraw my affidavit of support" for Sagoe because she had experienced a "change of heart," rejected his requests to move in with him, and concluded that marrying him was "out of the question" because of "irreconcilable differences."

- Officer Skwira spoke on the phone with Edward Opong, a childhood friend of Lassor identified by Abraham. Opong stated that when he visited Lassor in 2000 he learned Sagoe had refused to marry Lassor. Sagoe paid Lassor $7,000 to file immigration papers that would enable her to obtain a green card, then wanted nothing more to do with Lassor. She complained to Opong that Lassor demanded more money to follow through with the arrangement. Opong also described the couple's problem-ridden and argumentative relationship, describing a heated argument about the marriage arrangement while the three dined at a steakhouse in the Mall of America. Officer Skwira found Opong's detailed recollection credible.

- In 2001, Lassor represented himself as either unmarried or single on mortgage documents and did not designate Sagoe as beneficiary on his life insurance policies, 401(k), or pension plan. Sagoe opened a personal bank account in 2000 without informing Lassor. The couple did not open a joint account until June 2002. From

2001 to 2003, Sagoe's name was associated with four physical addresses but not with Lassor's two addresses in Woodbury, Minnesota. In 2001 and 2002, she listed addresses in Plymouth and Brooklyn Center, Minnesota as her "home address" on employment and health-insurance applications. Lassor's neighbors declared in affidavits that they did not know Lassor to be married and did not notice a woman residing with him. The Director's letter stated: "The lack of joint assets and shared lifestyle does not support a finding that your marriage was entered into in good faith."

- In an April 2002 medical visit, Lassor represented himself as single. Other Lassor medical records did not mention Sagoe, listing Abraham as a responsible party and one of Lassor's cousins as an emergency contact. After Lassor became ill in 2002, Sagoe did not accompany him to medical appointments.

- In February 2003, the month Sagoe and Lassor separated, Sagoe called the police when they got into a heated argument about Lassor's alleged financial malfeasance and infidelity. The resulting police report listed Sagoe as Lassor's "ex-wife." Over a year later, Sagoe asked the Woodbury Police Department to change the report to reflect Sagoe as Lassor's wife, not his ex-wife.

- Sagoe submitted no evidence supporting her claim that she obtained and submitted an amended death certificate because Abraham had fraudulently obtained the December 2003 certificate listing Lassor as single. His funeral announcement omitted any mention of Sagoe, and Sagoe did not make the funeral arrangements or grant Lassor's autopsy. The funeral program listed other relatives but not Sagoe as his wife. The Director's letter stated: "Your actions as described above are not typical of an individual who lost their husband."

**B. The Removal Proceedings.** Abraham, Officer Skwira, and Sagoe were the primary witnesses at an evidentiary hearing held in August and November 2011 to

consider Sagoe's objection to termination of permanent resident status and whether she should be removed.

Abraham testified that Lassor told Abraham in 1999 he was marrying Sagoe and introduced Abraham to Sagoe when she arrived in 2000. Lassor later told Abraham Sagoe no longer wanted to marry him; Abraham told Lassor to "withdraw [Sagoe's] papers." After Lassor became ill in 2002, Abraham accompanied him on hospital visits and had friends stay with him. After Lassor's death, Abraham arranged the funeral and cleaned out his house, finding no evidence a woman lived there. In February 2004, the funeral home told Abraham that Sagoe claimed to be Lassor's wife. She called Opong, who told her that Sagoe "paid [Lassor] to marry her so [Sagoe] could get papers." Based on the marriage certificate, a Minnesota probate court found that Sagoe was Lassor's surviving spouse. Sagoe sued Abraham for conversion of Lassor's personal property and Opong and Abraham for defamation.

Officer Skwira testified that she interviewed Sagoe in June 2004 regarding the pending I-751 petition and then did "a lot of investigation" before finding that Sagoe's marriage to Lassor was a sham. Skwira acknowledged that Abraham aided the investigation by supplying documents and identifying people to contact, including Opong. But Skwira relied on Abraham's information only to the extent it was corroborated by objective evidence and conducted her own, independent investigation into the bona fides of the marriage. Skwira typed her notes of the phone call with Opong as they talked; she found Opong's "really detailed information" credible because "[t]here was no benefit to him to lie." She was unable to contact Kudayah in New Jersey about $6,000 he had loaned to Sagoe.

Sagoe testified that a mutual acquaintance introduced her to Lassor in 1995. They courted over the next four years. Lassor visited Ghana in 1999 to finalize their engagement, and sent her gifts and money to assist with visa-related expenses. Opong brought her $500 in Ghana, and she met him again in Minnesota. She was not asked

whether she refused to marry Lassor, then paid him $7,000 to file immigration papers that would enable her to obtain a green card, as Opong told Officer Skwira in their phone call.

Sagoe testified that Lassor knew she was staying with Kudayah, a family friend, during her first days in the United States. When she arrived in Minnesota, Sagoe discovered Lassor had misled her about his employment and had a reputation as an "an alcohol user [and] womaniz[er]." Sagoe was "brokenhearted, because [she] . . . didn't know what [she] was getting [herself] into." After the two argued and Sagoe spent the night with a friend, Lassor drafted the letter withdrawing his immigration support as a threat, but the letter did not influence her decision to return home. After they married, Lassor was physically abusive, unfaithful, and mismanaged their finances. Concerned about her financial and physical security, Sagoe opened a separate bank account using another address, leased a new apartment, and borrowed money to buy a car from Kudayah who also co-signed her credit card. Though it was a troubled marriage with many short separations, the couple maintained joint accounts and resided at the home Lassor co-owned with Abraham until they separated in early 2003. Sagoe submitted affidavits from acquaintances who declared they had seen Sagoe and Lassor living together and a copy of her Minnesota driver's license, which listed Lassor's home address.

Sagoe testified that, after Lassor became ill, he thought she was too young to deal with the stress of his medical problems and wanted Abraham involved because she was a pharmacist. After he died, Sagoe offered to help Abraham arrange the funeral, but Abraham and Lassor's family chose not to involve her. The probate controversy and other lawsuits followed.

On November 18, 2013, the IJ upheld the I-751 denial, finding that "[Sagoe] did not have a bona fide marriage with her husband." The IJ found that neither Sagoe nor Abraham was credible; because of their "extreme animosity" and competing

financial interest in Lassor's estate, significant elements of their testimony were implausible or self-serving. The IJ gave the altered death certificate and police report submitted by Sagoe little weight. The IJ focused instead on documents Lassor filled out; documents from outside sources such as medical records, third party agreements, and tax filings; affidavits from Lassor's neighbors who were not connected to his family; and the testimony of Officer Skwira, which the IJ found credible. The IJ found that the government has "shown by a preponderance of the credible evidence that [Sagoe] did not have a bona fide marriage with her husband." On appeal, the BIA ruled that the IJ "properly considered the evidence regarding the commitment of [Sagoe] and [Lassor] to the marital relationship," noting "myriad" contradictions in the record. However, the BIA remanded for application of the correct burden of proof under 8 U.S.C. § 1186a(c)(3)(D) -- whether DHS has proved by a preponderance of the evidence that "facts and information . . . alleged in the [I-751] petition are not true with respect to the qualifying marriage."

On remand, because no new evidence was submitted and "the BIA did not disturb the [IJ's] credibility findings," the IJ incorporated her first decision, including findings that Abraham and Sagoe were not credible and Officer Skwira was "generally credible." In a lengthy opinion, the IJ found that the letter Lassor drafted to immigration authorities prior to the marriage, corroborated by other evidence including what Opong told Skwira, which the IJ found credible, provided strong evidence that Sagoe came to the United States to marry Lassor, changed her mind, and then "entered into the marriage for immigration purposes." The IJ acknowledged some evidence of joint assets and liabilities, but found they "were most likely created for immigration purposes and do not outweigh the other strong indications that [Sagoe] and her husband did not intend to share a life together when they got married." The IJ also found that Sagoe and Lassor "were not living together during their marriage," despite some evidence to the contrary. The IJ concluded DHS met its burden to prove that statements in the I-751 petition reciting that the marriage "was not entered into for the purpose of procuring an alien's admission as an immigrant"

were untrue. Accordingly, the IJ denied the I-751 petition, terminated Sagoe's permanent resident status, and ordered her removed.

Sagoe appealed to the BIA, arguing the IJ improperly relied on evidence obtained from third parties who did not testify, such as Opong; improperly found Officer Skwira credible when a document obtained through Sagoe's FOIA request revealed agency bias in favor of Abraham; gave improper weight to evidence presented by Abraham; and failed to consider evidence presented by Sagoe to support her claim. The BIA dismissed the appeal. The BIA concluded the IJ properly considered the evidence, upheld the IJ's credibility findings, and rejected the allegation of agency bias.

## III. Discussion.

On appeal, Sagoe argues DHS did not prove by a preponderance of the evidence that she married Lassor to secure an immigration benefit. First, DHS ignored the couple's long courtship and the issuance of a K-1 fiancée visa evidencing their intent at the time of the marriage. Second, the BIA "erred when it determined that [Lassor's] post-marital actions outweighed the couple's intent at the time of their marriage."[1] Third, the BIA failed to consider evidence in Sagoe's favor -- the Minnesota Probate Court's finding that Sagoe was the surviving spouse under Minnesota law; the outcome of her settled defamation suit against Abraham; the evidence of Skwira's possible bias; and Sagoe's testimony that independent actions she took were in response to Lassor's abusive and spendthrift behavior. Fourth, the BIA improperly relied on biased witnesses, Skwira and Opong, and on documents executed by Lassor

---

[1]Lassor's numerous unilateral representations that he was single or unmarried were relevant to whether "*the qualifying marriage . . . was not entered into for the purpose of procuring an alien's admission as an immigrant.*" 8 U.S.C. § 1186a(d)(1)(A)(i)(III) (emphasis added); see Abuya, 873 F.3d at 653.

over which Sagoe had no control.  Fifth, the BIA gave undue weight to Lassor's unsent letter, to medical records, and to the amended police report.

Our task on appeal is not to reweigh the evidence, as Sagoe urges, but to determine whether substantial evidence on the administrative record as a whole supports the agency's finding that Sagoe and Lassor did not intend to establish a life together at the time they were married.  See Abuya, 873 F.3d at 655.  Here, there is substantial *direct* evidence of the couple's intent at the time of marriage:  Lassor's unsent letter to immigration authorities; Sagoe's testimony that the letter was written when she left his home upon learning he had deceived her; and Opong relating to Skwira that Sagoe paid Lassor $7,000 to help her get a green card, all support a finding -- not inconsistent with the prior issuance of a K-1 visa -- that Sagoe came to the country intending to marry Lassor, changed her mind, and then entered into a sham marriage for immigration purposes.  In addition, DHS introduced substantial documentary and other evidence that the couple lived independent, separate lives after the marriage, maintaining just enough joint activity to support a claim of a valid but troubled marriage.

In conducting our review of the evidence, "[w]e defer to credibility findings that are supported by specific, cogent reasons because the IJ sees the witness testify and is therefore in the best position to determine his or her credibility."  Abuya, 873 F.3d at 655 (quotation omitted). "An IJ may base adverse credibility determinations on the lack of corroborating evidence combined with inconsistencies, contradictory evidence, or inherently improbable testimony."  Id. (quotation omitted).  Here, the IJ found Sagoe not credible because her explanations were implausible and much of her evidence self-serving.  The IJ also discredited Abraham's testimony, except when supported by objective evidence, because of her financial interest in the issue.  The IJ credited Officer Swkira's testimony and findings, including Skwira's decision to credit the information Opong provided in their phone call.  The IJ had a sufficient basis to credit Opong's account, which was consistent with the unsent letter Lassor

drafted and showed to Sagoe before their marriage. The BIA carefully explained why Sagoe's reliance on an unidentified internal agency memorandum did not provide a basis for reversing the IJ's finding that Officer Skwira "testified in a credible manner which was consistent with the information and evidence discussed in the [agency's] I-751 denial."

The additional contrary evidence cited by Sagoe on appeal does not persuade us that "any reasonable adjudicator would be compelled" to reject the agency's findings. 8 U.S.C. § 1252(b)(4)(B). The probate court's ruling that Sagoe was Lassor's lawful surviving spouse under Minnesota law did not address the issue before the BIA, whether the couple intended to establish a life together at the time of their marriage. Abraham's decision to settle the defamation litigation did not establish the truth of Sagoe's allegations, and in any event the IJ did not credit Abraham's testimony unless it was objectively corroborated.

In sum, substantial evidence supports the IJ's and the BIA's finding that DHS met its burden to show that Sagoe and Lassor did not intend to establish a shared life at the time of their marriage and therefore the statements to the contrary in their I-751 petition were not true. Accordingly, we deny the petition for review of the BIA's decision denying the I-751 petition, terminating Sagoe's permanent resident status, and ordering Sagoe's removal under 8 U.S.C. § 1227(a)(1)(D)(i).

_____